Good morning, Your Honors. Richard Hemmelreich of Tiffany & Bosco, appearing on behalf of the plaintiff's appellants. This is a case arising out of a Ponzi scheme, $900 million in losses by public investors after the company collapsed. About 3,000 investors involved that suffered the losses. Of the $900 million, approximately $700 million of the securities that were involved were sold under private offering memorandums, POMs that were issued or sponsored by a company called Mortgages Limited, which is a company that was operating the Ponzi scheme and the issuer here. The other $200 million was sold through an unlicensed dealer on behalf of Mortgages Limited named Radical Bunny. Bunny was the nickname of one of the managers of Radical Bunny. That's where that comes from. All of the investments, on their face at least, purported to be mortgage-backed securities. With respect to the $700 million sold under the POMs, all of the POMs included audited financial reports prepared by the auditor defendant, Mayor Hoffman. With respect to the $200,000 sold through Radical Bunny, and these were Mortgages Limited promissory notes, supposedly secured. It turned out to be unsecured. The Radical Bunny managers received and reviewed the auditor's reports, and that occurred under our allegations with the consent of Mayor Hoffman, as did the placing of the audit reports in the POMs. So those are the facts, briefly. The lead opening count is count 1, which is based on Arizona's securities laws. And that count was dismissed on 12b-6 motion. The fact that fraud had occurred was not an issue on the motion to dismiss. It was accepted. Mr. Hemerick, if I can help focus at least my concern, it appeared to me that the district court relied quite heavily on the Arizona Appellate Court's decision in Standard Chartered to invoke the safe harbor provisions under Arizona law for professionals like accountants, who, as I understand it, were negligent in the preparation of their audit reports. And I think your theory is that they should have discovered that there were, in fact, no mortgages that were backing these securities. But my concern is, what allegations do you have in the complaint that go beyond that act of negligence from which it would remove Mayor Hoffman from the safe harbor and render them liable? The allegations, Your Honor, are in the amended complaint as far as the securities claim is concerned. And they are specifically in the — they start on page 154, and they run through page 160, where the acts of scienter knowledge on the part of Mayor Hoffman are detailed. And what those allegations say, for example, is that by August of 2007, Mortgages Limited, its business had collapsed. It was a loan originator. It was no longer originating loans. That was a factual finding made by the SEC that we incorporated into our complaint. We incorporated all the SEC findings and those of the Arizona Corporation Commission. Mayor Hoffman knows under the allegations that are pleaded there in the pages I just gave you from its testing, its field testing on the audits, its testing for the loan origination fees. And it knows as a result of its own work that the loan originations have ended. It was also told by the CFO of Mortgages Limited that the loan originations had stopped. And you have $250 million-plus in new dollars that comes in after the auditors know that the loan origination business has stopped, $35 million in new dollars coming in on Radical Bunny. And you have a situation where the audit reports themselves state in the footnotes, they describe what Mortgages Limited's business is, which is it's a mortgage broker originating loans. And now the auditors know that that business has collapsed. So are you arguing a negligent misrepresentation claim that they should they knew or should have known based on the cessation of the loan origination fees when they issued those audit reports? We are arguing under the securities claim to show that they were an active participant and inducer that they But what you've outlined sounds to me more like negligent misrepresentation. And the problem I'm having with the argument is that I understand from reading the record that apparently there was a decision made, tactical or not, to not pursue the negligent misrepresentation claim when seeking to amend the original complaint. So why should we consider those same allegations when considering the remaining claims? Why should you consider them on the securities claim? Yeah. Well, the whole thing in standard charter was that the auditor there was simply a remote participant who did no more than at a business closing and the sale of one bank to another make its audit available, which any auditor would be expected to do at its client's request. But the allegations are here that Mayor Hoffman knew that fraud was occurring. I mean, this goes right to the core business has collapsed. Well, knew or should have known. I, you know, knowing that the business has stopped originating loans and knowing that money is still coming in, in my mind, stops short of establishing scienter on the part of the accountant to establish fraud. I mean, I'm comparing the accountants here to what I believe to be the remaining claim against the lawyers who actually assisted in the drafting of statements once they told their client, what you're doing is in violation of the Arizona securities laws. And I understand the district court refused to dismiss the lawyers because of that fact. We don't — I don't see an allegation to that effect with regard to the accountants. What the auditors did here that's different than what occurred in standard charter is that — well, let me back up. In standard charter, the Pricewaterhouse, the auditor, is not involved until the closing. It's not involved at all in the solicitation or offering process. It's not made its audit reports available to help encourage and solicit investments. If you change the facts a little bit and make them — You say — you allege they were involved, but as I understand it, your theory of involvement is that in the face of what you just represented, they nonetheless issued clean audit reports knowing that those reports were going to be shared with others beyond the client that they prepared the report for. But what more do you have beside that fact to establish that they were actually involved in the sale of the securities? Once you agree to bundle, make your audit report part of a solicitation document, which is what a POM is, you've crossed the line there. You've now turned your audit into part of the sales documents. But what do we do with the Arizona case law that points out that it is not uncommon for audit reports to be shown to others by the client and that the accountants owe no duty to third parties? Their duty is owed to the client. And in the standard charter situation, as I read that case, I thought the issue was in connection with the sale of the bank, that the accounting firm Price Waterhouse knew that their reports were going to be disclosed to the prospective purchaser, who was obviously interested in determining the financial condition of the bank that it was acquiring. But the Arizona court nonetheless said that's not enough to establish liability for security fraud. And that makes perfect sense. In a business closing where you have a one-time transaction where an auditor is asked by its client to make an audit that's already prepared, available, so that the sale of the business, the bank, can close. But if you go a step further and just change the facts just a little bit in standard charter so that they match up more with what's going on here. Let's suppose that standard charter needs to raise some money to make this purchase of the bank. And it decides it's going to prepare an offering memorandum. And so it goes to Price Waterhouse, its auditor, and it says, can we use your audit report and our offering memorandum to raise some money? And we need $300 million. That was the purchase price. Now you've put out there your audit report as part of the offering materials that are being used to solicit and encourage investors to bring in money. But under your hypothetical, the accountants now have a new client, do they not? The new client is not the bank that's being acquired. It's the acquiring bank in order to help it raise the funds. But the duty that exists here is a duty that's imposed by statute under the Arizona And that's what you do. I guess I'm still struggling. I don't think you've answered my question. I'm sorry. What act of participation do you allege the accountants engaged in beyond simply giving permission or acknowledging or not objecting to the fact that Mortgage is Limited was going to share the audit reports with prospective investors? The act is that this is ongoing. You have to consider the duration here, too. This is going on for three years in 11 different private offering memorandums. I understand all that. My question, I don't think it is all that difficult. Either you have an allegation of active participation or you don't. And I'm asking beyond the preparation of what appears to be, according to your allegations, a negligently prepared audit report which issued a clean opinion when a competent accountant should not have done that. What more do you have to show that they were participating in the sale of these? They knew their audit report was misleading because, among other things, it represented that Mortgage is Limited was a loan originator when they knew that it was not a loan originator. And it authorized that misleading, knowingly misleading audit report to be distributed to investors, and you have $250 million in new money coming in where investors are getting that solicitation document. May I just try to understand it a little bit better? I understood your argument essentially was an effect. Who's kidding whom? These auditors had a 10-year relationship with this company. It wasn't just ineptness. It wasn't gross negligence. One can infer on the basis of what you have alleged in the complaint that they knew better and they were deceiving folks, okay, people who might invest. It was an act of deception, and an act of deception equals participation. Isn't that your argument? That they knowingly participated in an ongoing course of conduct, knowing that their offering memorandums were misleading because they were obligated to read them under gas, and the offering memorandums represented that Mortgage is Limited was currently in the loan origination business, its core business. So you've said they lied. They lied, in effect, is what you're saying. Not that they were misleading, not that they were sloppy, not that they didn't confirm the security that didn't exist, but that they affirmatively misled. They affirmatively misled. And they thought it was a two-part definition of participation in standard charter. The first part of it was, which wasn't considered there, they only considered the part in standard charter that says if you partake in the sale, if you have a stake in it, you can be liable, and they said no. The second part, which was reaffirmed in the 2000 Grand decision, Grand v. Notch, which is much more in point with respect to this case, was that if you take part in an activity or an enterprise that's in common with someone else, that can be participation. And that's what they did here. They joined with Mortgages Limited in helping Mortgages Limited solicit, knowing that both the POMs and knowing that the audit reports were falsely depicting Mortgages Limited in being in the loan origination business. So that kind of joint, ongoing activity is a form of participation. There's also inducement here, too. It is your – does it matter that they received no portion of the proceeds from the sale of the securities? It would under the second leg of the participation test in the standard charter if you have a stake in it, not under the first where you take part in an activity or enterprise in common with someone else. And here you're – So yours is what, an aiding and abetting theory? It's just picking up the language, Your Honor, the definition of participation. I thought that Arizona Supreme Court had ruled that there is no aiding and abetting theory under Arizona State securities law. It did. But it did not in any way modify the test that's laid out in the standard charter. And it left open whether participation and inducement might be broad enough to cover aiding and abetting. But that's not an issue here. Do you want to save some time for rebuttal? You've got two minutes left. Yes, Your Honor. Okay. Very well. Let's hear from CBIZ. Good morning, Your Honor. May it please the Court. I'm Louis Chaitin from Jones Day on behalf of Appalese, Mayor Hoffman McCann and the CB's entities. And with me here today is my partner also from Jones Day, David Adler. As the Court knows, the – I'll start, if I may, with the Securities Act claim. And if there's time, I'll address the Negligent Misrepresentation and Investment Management Act. As the Court knows, the leading case – Are you having a hard time hearing? Am I not speaking loud enough? Or is it a technical problem? I can speak louder. Well, let's see if we can fix the technical problem. Well, I just want to make sure you can hear. I do, too. Mr. Hamler. Testing. Wow. That is – That's good. Much louder. All right. Even I can hear you. Yeah. I think I moved a little closer to the microphone, too. Raise your hand if you can. Okay. Great. The leading case defining what participation and inducement mean for purposes of the Securities Act under Arizona law is, of course, Standard Charter v. Pricewaterhouse. And it also happens to be the only Arizona case that deals with auditors, and it happens to be right on point. And the holding is that an auditor who conducts annual audits and would have conducted the audits, regardless of any securities transaction, does not participate in or induce a transaction, even if it knows and formally consents to the audit report being used in the transaction and attached to securities filings. And if you look at the definitions in Standard Chartered and Grand of participate, what you see is, in Grand – let's take Grand. The defendants – this is at paragraph 15 of the Grand decision. The defendants, Nacho and McMasters, got on a plane, flew to Arizona, met with the plaintiff, encouraged him to invest in this Quest joint venture, made all sorts of misrepresentations to him, knew about accounting fraud at Quest, and didn't tell him about it. And that was not participation. And it was not participation, the court said, because they had no stake. The defendants had no stake in the sale, and they didn't draft the sales agreement. And then let's look at the definitions of induce. Standard Chartered says it's an active definition. It's purposeful. You have to be trying to sell securities. It's not enough that an auditor knows that the client will use the audit report to try to sell securities. To have induced, the auditor has to be trying to sell securities. And Grand affirmed this definition. It relied on this definition. That's at paragraph 24 of Grand. It said in Grand that it was a classic case of inducement. And then it said C, Standard Chartered, defining inducement. And the reason it was a classic case of inducement is that Nacho and McMasters got on a plane, flew to Arizona, met with the defendant, and encouraged him to invest in this joint venture.  Sotomayor, your position, then, is that no matter how deficient, no matter how grossly distorted the numbers are, no matter how many oversights and how no matter how many inferences one can draw about knowledge, the accountant is out from under Arizona law? Well, there are a few responses to that. First of all, you have to meet participation or inducement to be liable under the Securities Act. If you know about fraud and you assist the fraud, that would be an aiding and abetting claim, and the government can bring that claim. But Arizona, in that recent case, Selvy Gamma, decided that you can't have a private right of action for that claim, and it's following Federal law in that respect. But we all know that the line between acting as a principal and the line between clear under Arizona law, given the definition of participation and inducement that Arizona has adopted. It doesn't have to do with your state of mind. Now, I really do want to address this Sienta argument, because there's a new argument that they're making in their reply brief. In their opening brief, they said there's a safe harbor for participation for people acting in the ordinary course, and you don't get to take advantage of the safe harbor if you were knowingly assisting in fraud. But that's the second step in the process. The first step is you have to decide whether there was participation or inducement. And if someone participated, then even if they participated, you might be able to take advantage of a safe harbor if you were just acting in the ordinary course. In the reply brief, they're making a different argument, which is even if you would otherwise not meet the definition of participation or inducement, you can fall within that definition if you knew about fraud. And this is a new argument in the reply brief, and it's not an argument they raised in the district court. If you look at their motion for leave to amend and their reply in support of their motion to leave for amend, they didn't make that argument. And they — if you look at the district court opinion, when the district court addresses — But doesn't it come pretty close? As I understand Mr. Himmelreich's argument, if the accountants knew that Mortgages Limited had stopped originating loans and they knew that the loans were not in fact secured by the mortgage — or the securities were not in fact secured by the mortgages, what more does the plaintiff have to show if the evidence shows they knew darn well that their audit reports were being used to induce the investors to buy the securities? They have to show that they were doing more than formally consenting to that. They were actually trying to solicit security sales. And that's the allegation that's missing. My question is if the accountant knows that the client is making a false representation because it conducted an audit and discovered the truth, is your position that they have absolutely no duty to tell — at least to tell their client, stop making that claim? They might have a fraud claim. They might have an aiding and abetting claim, except for Arizona eliminated aiding and abetting, except for actions by the government. But it doesn't meet the definition of a participation in inducement. And it's telling that in the district court opinion on this. This is at ER-7. The district court addresses Sienter with respect to Meir Hoffman, and it addresses it in the context of the aiding and abetting claim, because that's what they were arguing. And so — but let's assume that that's not a problem, that this is an argument they had been making all along. And by the way, I should mention that if you look at the allegations in the amended complaint that he refers to for Sienter, this is at ER-39 through 41. This is the — look at the table of contents for the amended complaint. There's a section C that says Meir Hoffman's role. And then if you go down to number 9 on the next page, it says Meir Hoffman aided and abetted a securities violation. And then it has a section that says substantial assistance, and then it has a section that says Sienter. It was all — this was all arguing for — it was an argument made in pursuit of an aiding and abetting claim. But let's just assume that they were arguing that there is a Sienter exception to participation inducement. If you have Sienter, you've, by definition, participated in inducement. Well, one, I don't think they have any authority for that proposition. If you look at Grand, Grand is a case involving allegations of Sienter. Grand is a case involving allegations of scheme liability. Grand is a case where the defendants, Nacho and McMaster, flew to Arizona and made all sorts of representations, misrepresentations to the defendant to try to solicit a securities transaction and did not tell him about the accounting fraud. And nevertheless, the Court holds no participation. Well, if Sienter is an exception to the participation in inducement requirement, Grand should have come out differently. The other thing is, if you look at the district court's analysis of the Sienter allegations, I think it's entirely correct. So first of all, the district court says you have to be aware of the fraud. This is at ER 5 and 7. And under Arizona law 44-2082 of the Arizona revised statute, you have to plead the same way you would in Federal court under the PSLRA. You have to plead a particular fact showing a strong inference of Sienter. And I think the direct district court correctly concluded that the amended complaint doesn't do that. And let me explain why. If you look at the argument they're making in their reply brief at pages 6 to 7, they say there's an auditing standard, SAS 8, S-A-S 8. And this is a standard promulgated by the Auditing Standards Board of the AICPA. And they say that standard gave us a duty to investigate. And we should have investigated, and we didn't. Well, the same thing was true in standard charter. Price Waterhouse was alleged to have violated gas, and if they had done a good audit, they would have discovered the misrepresentations in the financial statements. And then look at the allegations of what it is Mayor Hoffman supposedly knew, the allegations of Sienter in the amended complaint. And I pause to note that this is after a lot of discovery that they're moving for leave to amend. They obtained a large amount of discovery from mortgages, limited successor and interest. They obtained all of Mayor Hoffman's work papers. They obtained Mayor Hoffman's internal e-mails. They obtained hundreds of thousands of pages of mortgages limited documents. So let's see. What did they come up with? Where's the smoking gun for Sienter? So first they say, they say, we knew, they conclusively allege, we knew that the radical bunny notes were not secured. Well, if you look at what they actually allege, this is paragraphs 534 through 537 of the amended complaint. It's ER 158, 159. They say they actually allege that it was ambiguous whether the notes were secured. They say that Mayor Hoffman received confirmation letters from Mortgages Limited and Radical Bunny saying the notes were secured, but it was, quote, ambiguous. Those letters were ambiguous and we should have followed up. Those aren't my words. Those are the actual allegations of the complaint. They say a reasonable auditor would have realized the notes were contrary to the commercially normal way that secured notes are written. That's not Sienter. That's not awareness of fraud. They say Mayor Hoffman did not investigate a lawsuit filed against ML in 2008, and this is at amended complaint 547, 548. And they say this is contrary to AU 561, which, again, is an auditing standard. And they said we didn't investigate the lawsuit. Again, that, it's not Sienter. It's not an awareness of fraud. And the loan origination issue. They say that note one of the footnotes of the amended, of the financial statement, financial statements say that Mortgages Limited was involved in loan originations and that we knew in late 2007 that they were not and should have discussed that with management. This is at paragraph 529 of the complaint. Well, there's no allegation that Mayor Hoffman knew that there would be no more loan originations. And more importantly, the complaint itself alleges that Mortgages Limited adopted a risky business strategy, a strategy under which they would originate fewer but larger loans with delayed funding commitments. That's at paragraphs 102 to 103 of the complaint. So there's, the loan volume did not diminish. There were the same number of loans. They were just larger loans with delayed funding commitments. So there's nothing untrue about the note in the footnote that Mayor Hoffman or Mortgages Limited was clearly involved in loan originations in 2007. There's certainly no basis for Sienter. And Ms. Appellant's counsel referred to some SEC allegations against Mortgages Limited securities, securities wings that noted that loan originations stopped. But those allegations actually say that there were, they stopped in August 2007, but there were a few more originations late in 2007. That's at Lead Plaintiff Supplemental Excerpts 4. They allege that Mayor Hoffman knew that two employees resigned in late 2007. And this is paragraph 518 of the amended complaint. They should have asked the employees their reasons for leaving. That is not knowing participation in fraud. These are violations, alleged violations of auditing standards, not actual awareness of fraud. And there are a couple more points on Sienter, too. All of these allegations of Sienter are allegations relating to 2007. The complaint says that the financial statement, the audit report for the 2007 financial statements was released in March of 2008. That's the amended complaint, paragraph 521. So even if this were enough, it would be, and it's not, it would be, it would limit plaintiffs to people who invested after March 2008 in a company that went bankrupt in June 2008. And I don't, plaintiffs aren't alleging that anyone actually saw those financial statements. Finally, where is the motive? In cases against auditors where Sienter is found, it's very difficult to show a motive. Why would Mayor Hoffman ruin its reputation, risk its reputation, risk its ability to keep going as a company to knowingly assist in fraud for what, three years of audit fees? It's just, these are not plausible allegations of Sienter, much less allegations that rise to the level of a strong inference. And these are the allegations that they proposed making after discovery. I thought Mayor Hoffman had audited the predecessor to Mortgages Limited. Hadn't they done the outside work for the fellow who committed suicide for his father? They had been the auditor for Mortgages Limited for years. Right. And that's one of the reasons they haven't participated and induced it. They were, they're alleged to have been a general auditor, a general outside auditor that audited them for all purposes, primarily, frankly, the need to file audited financial reports with the State of Arizona for a commercial banker. They didn't audit. The other attempts that Appellant's counsel makes at distinguishing Standard Chartered, I think, are unconvincing. He mentioned that in Standard Chartered, Price Waterhouse was not involved in the securities transaction, the solicitation of the transaction. Well, in Price Waterhouse, the transaction, the closing of the transaction, there'd be no transaction without the closing, and the closing entirely hinged on Price Waterhouse consenting to and providing an audit opinion. And that's at 945 P. 2nd, 325. If I may, I'd like to touch briefly on the negligent misrepresentation claim. And, again, the only issue on appeal here is whether the district court was correct in dismissing the original complaint because they dropped, and that's not my word, by the way. That's their word. In their motion for leave to amend to the district court, they said we are dropping all of the claims except for the Securities Act and the aiding and abetting claims in order to streamline the litigation. And in our brief, we addressed two issues. They also said to preserve their appeal on the dismissal of the original complaint. I agree with that. They can appeal the dismissal of the original complaint, but what they can't do is say that the district court should have allowed them to go forward with a negligent misrepresentation claim based on the allegations of the amended complaint, when they never asked the district court to do that. I understand that. But it's a little disturbing. Is it not, given the allegations in the amended complaint, that we would use the vehicle of 12b-6 to jettison that claim, given what we need to do, given what is now alleged in the amended complaint? Doesn't it strike you as being unusual? Well, one thing, I think it would be a very dangerous policy for this circuit to allow that. The original complaint in this case was filed almost 5 years ago. The dismissal was almost 4 years ago. They move for leave to amend. They tell the district court, we don't want to proceed with a negligent misrepresentation claim, we just want to appeal the original dismissal. And then they come up here and say that the original dismissal was wrong because of allegations in a later complaint that we told you we weren't filing for purposes of a negligent misrepresentation claim. It just — I think it's unfair to the parties, years later, to do that on appeal. I think it's unfair to the district court to say — frankly, I think it's — I don't think that's even a matter of de novo review, if you're saying that they should have been able to — they should be able to appeal based on what was in the amended complaint because the district court could not have abused its discretion in not allowing that claim to go forward when they weren't even asking for it in their motion. The one thing on — since I'm running out of time, there were two issues in the brief on negligent misrepresentation. One was duty and one was reliance. And reliance, I think, is the much more straightforward issue because the district court correctly held that they have not alleged reliance. What they alleged, repeatedly, was that Mayor Hoffman knew that investors would rely on the audit reports. Well, they're coming at it from the wrong angle. They know whether — whether the individual plaintiffs in this case reviewed the audited financial statements and reviewed the audit reports, and they don't allege they did. And so the district court was correct in saying you haven't alleged reliance. That — these are facts within named plaintiffs' knowledge, and they don't bother alleging them. And I don't think it's an oversight. The — I won't go beyond the record to say there was testimony of — well, I won't go beyond the record. They had an opportunity to amend. The district court says no reliance. You haven't alleged that any individual plaintiff actually reviewed the audited financial statements or the audit reports. Instead of coming in in the amended complaint and adding allegations of reliance, saying, yes, I did, I reviewed the audited financial statements, and it was significant to me for this reason, facts within their knowledge, they drop the claim and don't include any such allegations. And the other reason I don't think it's an oversight is the plaintiffs in this case were not investing in mortgages limited. The financial statements that were attached to the POMs were mortgages limited financial statements. Plaintiffs here were investing in mortgage-backed securities, and their investment depended on whether the borrower repaid the loan and the underlying collateral on the real estate. The POMs themselves, and this is at Lead Plaintiff Supplemental Excerpts, page 64, the POMs themselves say you are not investing in mortgages limited. We've attached mortgages limited financial statements. Those financial statements give you no indication of how your investment is going to perform. And at what point, then, did they tell the SEC that the financial statements are used to secure additional funding and to provide evidence of financial stability to investors? That's at paragraph 301 of the complaint. And what it says is there's a risk assessment document in mortgages, in Mayor Hoffman's work papers, that said Mayor Hoffman knew that the audit reports would be used to raise additional funding, that the financial statements would be used to raise It doesn't say audit reports, actually. It doesn't say anything about Mayor Hoffman's audit reports. It says financial statements. Financial statements were used to raise additional funding and for purposes of investors who are interested in mortgage-backed securities. And that really goes to the duty question, I think. Based on the original complaint, that is not an adequate allegation of a duty, because that's everyone. That is all investors in mortgages limited, and even beyond that, all investors in mortgages limited's creditor, Radical Money. But this occurred at a time when things were going terribly wrong. Am I not correct? Redemptions were not happening. Cash was needed pronto. I'm sorry. I'm a little confused. The work paper itself? No, no. The statements in the the statements that were used were used, according to your client, to secure additional funding. What I'm saying is to secure additional funding when the, you know what, had hit the fan. They were in desperate shape at that point. Well, the work papers don't say that, that's for sure. The work papers say that financial statements will be used to raise money and to give to investors, which all financial statements are used for. I don't think it really establishes much of anything. The Court has no further questions. Anything further? Thank you very much. Thank you. Mr. Hilmerich, I think you have a couple of minutes left. Thank you, Your Honors. I would urge the Court to read carefully two cases. One obvious, and that's Grand. And the other is Judge Merguida's opinion in this very case. She was the first district court judge assigned to this case, and she wrote an opinion on participation and inducement dealing with the officer and director defendants, and she applied Grand. And why the way she applied it is important is because Grand liberalized the standard for pleading. And Grand was a pleading case. It's all about pleading, not a case decided after trial like standard chartered. And what Grand held, a couple of things that are relevant here, that the provisions of the Securities Act, including the participate and induce standard, are to be liberally construed. And it describes those words, that language, participation and inducement, as broad, sweeping language. The second thing that Grand did by way of liberalizing and adding something to what standard charter had held was it added something to how you can prove inducement. Counsel, aren't we, though, focusing on cases of the Arizona courts that were decided after Judge Merguida handled the initial phases of this case? I mean, standard charter obviously was around, but Grand itself was a 2010 case, and there are a number of other cases in 2013, 2012 that were cited in the briefs that she didn't have the advantage of. Judge Merguida specifically relied on the 2010 Grand decision, and what she said, she interpreted it as holding that you have to liberally interpret, participate and induce. And under that interpretation, she declined to even make a distinction between participation and inducement. And in three paragraphs, she said it was either participation or inducement. But I guess the concern I'm having is that in a State securities fraud action, are we not bound by the determination by the Arizona Supreme Court in particular on these issues? I mean, they are the final expositors of State law and the meaning of those terms, are they not? I must be missing the question. Undoubtedly, you're bound by Grand's interpretation. And Grand, one of the things Grand did that I haven't mentioned is it lowered the bar on how you prove inducement. You can prove it by showing acts of encouragement, and it can be encouragement by omission, which in that case was omitting disclosure of an accounting fraud, which is similar to what we have here, omitting disclosure of the death of the loan origination business in the audit reports. So both of those cases, they add something to standard charter, and they create a much more expansive interpretation at the pleading stage, which is what Grand was talking about. How do you plead it? And Grand also made the point, which Judge McGeer applied, that you don't need to separately go through an analysis, judges don't, of inducement and participation. If there's fraud that's been pleaded, and it's sufficient, and that was a given on our record, that they were accepting our fraud allegations against Mayor Hoffman, what Grand, Justice Hurwitz writing, was saying was you don't parse the complaint. If there's fraud here, it will – that language is inclusive language. And by that, what he was saying was that if there's fraud, it's going to fall under the making, participating, or inducing language, and so we don't have to go through this separate analysis. Counsel, your time has expired. Thank you. Thank you very much. The case just argued is submitted. We'll get you a decision as soon as we can.
judges: Dearie, Tallman, Rawlinson